UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


VICTORIA DAVIS,
      Plaintiff,



v.                                                                                    CIVIL ACTION NO. 15-12773-RGS



SUN LIFE ASSURANCE COMPANY
OF CANADA,
      Defendant.



REPORT AND RECOMMENDATION ON
DEFENDANT SUN LIFE ASSURANCE COMPANY
OF CANADA'S MOTION FOR SUMMARY JUDGMENT (#27) AND
PLAINTIFF VICTORIA DAVIS'S CROSS-MOTION FOR SUMMARY JUDGMENT (#29).


KELLEY, U.S.M.J.

## I. Introduction.

Plaintiff Victoria Davis is a participant in the Employee Retirement Income Security Act

(ERISA), 29 U.S.C. §§ 1001 *et seq.*, welfare benefit plan issued to Apex Global Partners,

plaintiff's former employer, by defendant Sun Life Assurance Company of Canada, who insures

and administers the Policy.[1] Davis claims that Sun Life unreasonably and unlawfully denied her

long-term disability (LTD) benefits due to her under the Policy, in violation of 29 U.S.C. § 1133,

and that Sun Life, as the claim administrator, breached its fiduciary duty to plaintiff, in violation

of 29 U.S.C. § 1002(21)(A)(i). (#6 ¶¶ 22-32.) Davis brought this action pursuant to 29 U.S.C. §

---

[1] The welfare benefit plan and insurance policy are a single document (the Policy).

1132 challenging the propriety of Sun Life's actions on both procedural and substantive grounds. *Id.* ¶¶ 6-8, 23, 33, 34. The parties have filed cross-motions for summary judgment (##27, 29) on the Administrative Record[2] (#24), which have been fully briefed (##27-31, 34-39, 42), and a hearing was held on July 18, 2017 (#48).[3]

## II. Standard of Review.

The First Circuit has stated that "motions for summary judgment in this context are nothing more than vehicles for teeing up ERISA cases for decision on the administrative record. The burdens and presumptions normally attendant to summary judgment practice do not apply." *Stephanie C. v. Blue Cross Blue Shield Of Massachusetts HMO Blue, Inc.*, 813 F.3d 420, 425 n. 2 (1st Cir. 2016) (internal citation omitted). "[A] challenge to a denial of benefits is to be reviewed de novo 'unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Id.* at 427 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). While contested in the papers, Sun Life, at the July 18th hearing, conceded that de novo is the appropriate standard of review in this case. *See* #48.[4]

---

[2] The administrative record will be cited as AR at (page number).

[3] While the court did not entertain supplemental post-hearing briefing on the parties' positions with respect to summary judgment, plaintiff's counsel proffered several cases at the conclusion of argument, and defendant, in response to an inquiry by the court, submitted an affidavit clarifying which documents were included in the appellate physicians' review. *See* #49. Specifically, the court sought clarification from defense counsel as to whether the statement noted in several of the reviewing physicians' reports that "[c]orrespondence from the claimant was reviewed," (AR at 2416, 2428), and the category listed as "MISC" on the "records provided for review" section of each of the appellate medical reviewers' opinions, *id.* at 2413, 2420, 2426, included Davis's statements that she submitted as part of her appeal. As for the cases submitted by plaintiff, it bears mention that they are either readily distinguishable or no longer good law.

[4] There is no transcript of the July 18th hearing, however, the court has listened to the entirety of the recording of the hearing prior to issuing this Report and Recommendation.

> Where, as here, a challenged denial of benefits is subject to de novo review under
> ERISA [. . .], '[the court's] task [. . .] "is to independently weigh the facts and
> opinions in the administrative record to determine whether the claimant has met
> [her] burden of showing that [she] is disabled within the meaning of the policy."'
> *Scibelli v. Prudential Ins. Co. of Am.,* 666 F.3d 32, 40 (1st Cir. 2012) (quoting
> *Richards v. Hewlett–Packard Corp.,* 592 F.3d 232, 239 (1st Cir. 2010)). In so
> doing, we give no deference to the administrator's opinions or conclusions. *Id.*

*Gross v. Sun Life Assur. Co. of Canada*, 734 F.3d 1, 17 (1st Cir. 2013) (some alteration in original); *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 518-519 (1st Cir. 2005). "In other words, [the court] stand[s] in the shoes of the administrator to 'determine . . . whether the administrative decision was correct.'" *Richards*, 592 F.3d at 239 (internal citation omitted).

### III. Procedural history.

Davis began her employ with Apex in 2008.[5] (AR at 119.) She held the position of Executive Vice President – Benefit Partners Division[6] for which she was paid an annual salary of $325,000.00. *Id.* at 610, 615. In this capacity, Davis was covered under the Policy, which was issued by Sun Life to Apex to fund Apex's employee benefits plan. *See id.* at 25-111.

Davis has struggled with obesity throughout her life. *Id.* at 403. In 2003, she was diagnosed with sleep apnea for which she has received ongoing treatment. *Id.* at 144, 172. In addition, Davis has suffered from arthritis, spinal stenosis, and several other comorbid conditions for a number of years. In 2009, she underwent weight-loss surgery that initially resulted in a loss of 75 pounds but, over time, Davis regained all of the weight she lost and more. *Id.* at 143-144, 148, 191, 403, 1550.

---

[5] From all that appears, Davis owned her own business which was acquired by Apex in 2008. (AR at 327, 401.) She then "remained on staff for [Apex]." *Id.* at 327, 401; *see also id.* at 1562-1563. Some confusion arises in that Davis, in her initial claim for partial disability, lists her dates of employment with Apex as "1995 to present," *id.* at 20, while Apex's employer's statement says that she was hired March 1, 1999, *id.* at 119. At any rate, the date Davis was hired has no bearing on the court's analysis.

[6] This title is taken from Davis's employment contract. The job description for plaintiff's position that was provided to Sun Life by Apex refers to the position as "ERISA attorney." (AR at 130.)

Due to her physical limitations resulting from her comorbid conditions, and in accordance with her Apex employment agreement, Davis worked primarily from her home. *Id.* at 443, 611. While Davis managed her comorbid conditions such that she was able to perform her duties for Apex for several years, she claims that beginning in 2011 and culminating in 2012, her conditions exacerbated such that she suffered cognitive and physical impairments rendering her disabled. *See generally* #6.

On May 28, 2012, plaintiff submitted a LTD claim to Sun Life seeking partial disability. *Id.* at 17-24. On the claim form, Davis noted that she continued to receive full pay and stated that Apex was "aware and is completing the employer statement." *Id.* at 17. With respect to the onset of disability, Davis described it as "progressive" and listed the date she first noticed symptoms as March 2011. *Id.* at 18. She identified her conditions as "Sleep Disorder/Concentration & Memory Issues/Spinal Stenosis." *Id.* As for plaintiff's last date worked prior to disability, the claim packet reads "partial days." *Id.*

On June 8, 2012, Otis Goodall,[7] the Sun Life claim consultant assigned to Davis's partial disability claim, spoke with Davis via telephone regarding her recently filed LTD claim. *Id*. at 114-115 (post-call follow-up letter); 400-401 (Goodall's telephone memorandum). According to Goodall's notes, Davis told him that she started to notice memory problems in December of 2011, which resulted in an inability to complete projects. *Id.* at 400. When pressed for a date of onset, plaintiff told Goodall that she was unsure because the progression was gradual, but that the memory problem happened quickly in December 2011. *Id.*

---

[7] Goodall is referred to as both "Otis" and "Robert" in the Administrative Record. *See, e.g.*, AR at 15, 114.

Goodall informed Davis that, as of June 2012, it was his opinion that she did not have a viable claim for partial disability because she could not show any loss in earnings, as is required for such a claim.[8] *Id.* at 401. In response, Davis stated that she still wished to pursue her claim because it was her belief that she would suffer a loss in earnings in the near future, given that her contract with Apex was set to expire that month and would likely be reduced, if not terminated entirely, shortly thereafter. *Id.* at 400-401.

On June 20, 2012, Davis received a letter from William DeArman, an executive of Apex, in which DeArman informed plaintiff that she had been terminated from Apex for cause.[9] *Id.* at 139-140. DeArman explained to Davis that on June 1, 2012, Apex had been contacted by Sun Life in an effort to obtain information as to "when it was that [Davis] went to part-time employment," *id.* at 139, and that, at that point, Apex was unaware of any such change in plaintiff's workload, especially since Apex continued to pay Davis her full-time salary.[10] *Id.* at 139-140. The letter went on to state that Brian Blakeman, another executive of Apex, had reached out to Davis via telephone for clarification regarding plaintiff's employment status and that Davis told Blakeman that "despite being paid by Apex for full-time work, [plaintiff] had not actually been working full-time since December 2011." *Id.* at 139. In addition, Davis told

---

[8] Under the Policy, employees earning $100,000.00 or more per year are partially disabled if "[t]he Employee because of Injury or Sickness, is unable to perform the Material and Substantial Duties of [her] Own Occupation and the Employee has Disability Earnings of less than 80% of [her] indexed Total Monthly Earnings." (AR at 48.)

[9] Davis disputes the veracity of several of Apex's statements and its justification for terminating her position as set forth in the letter. Neither issue is the subject of this litigation. The letter establishes a date of last insured, June 20, 2012, and explains that Davis was receiving her full salary prior to this date, thereby confirming her inability to qualify for partial disability.

[10] Apex's lack of knowledge with respect to Davis's claimed partial disability is also evidenced in a June 4, 2012 email from Amanda Moore, an Apex employee, to Jennifer Sagris of Sun Life. *See* AR at 133 ("The date of disability is unknown to us because [Davis] has not informed us as her employers that she is working a decreased schedule. As of the 5/31 payroll she has been consistently paid her regular salary.").

Blakeman "that it was important to report to Sun Life that [she was] working part-time for the last 90 days to eliminate the need for short term disability benefits . . . and, instead, to receive long term benefits . . . ." *Id.* DeArman characterized this request as Davis asking Apex to be complicit in her efforts to mislead Sun Life in order for her to receive LTD benefits. *Id.* In the same letter, DeArman informed Davis that the conversation between Blakeman and plaintiff, of which DeArman was present for "much of," *id.*, was the first time that any executive at Apex "knew or had heard any mention of [her] not working full-time at Apex." *Id.* DeArman concluded the letter by noting several other issues with Davis's performance and stated that the combination of her "recent, questionable and potentially fraudulent conduct, along with longer term failures to perform" necessitated that she be terminated. *Id.* at 140.

On July 5, 2012, Goodall and Davis spoke over the phone regarding the status of her claim. *Id.* at 388. On this call, plaintiff advised Goodall that, based on her recent termination, she needed to change her claim from partial disability to total disability as of June 20, 2012.[11] *Id.* Davis told Goodall that Apex was in fact aware of her modified work schedule and that "she hadn't billed [Apex's] client more than 40 hours per month in quite some time." *Id.*; *see also id.* at 141. When questioned about the timing of her limited work schedule and when it first started, Davis said that it was gradual, but again noted that she "began having memory issues in December 2011 so that [was] probably the key date when [she] dropped a significant number of hours worked per week." *Id.*

On July 20, 2012, Goodall conducted an in person interview with Davis at her home. *Id.* at 402-420.

---

[11] From this date forward Davis's LTD claim was treated as one for total disability.

Over the course of the next four months, Goodall and Davis exchanged communications relating to the need for missing documents and the claim's tolled status until all necessary documents had been received by Sun Life. *See id.* at 173, 229-230, 304, 324. On November 6, 2012, Goodall informed Davis that Sun Life was in possession of the requisite documents and that the claim was awaiting review by defendant's medical consultant. *Id.* at 365.

A. Medical History through the Initial Decision.

Davis's relevant medical records that were incorporated as part of her initial claim review are set out below.

On January 29, 2010, Davis treated with her rheumatologist, Marian Sackler, MD (Dr. Sackler) regarding the worsening of plaintiff's comorbid conditions, including osteoarthritis, hypertension, and obstructive sleep apnea. *Id.* at 193-195. Davis reported difficulty walking and tingling and redness in her feet. *Id.* at 193. Thereafter, on March 12, 2010, Davis returned for a follow-up with Dr. Sackler and noted improvement in her condition. *Id.* at 190-192.

Four months later, on July 30, 2010, Davis was seen again by Dr. Sackler. *Id.* at 187-189. She reported going downhill since her last visit, with her back being the chief complaint, and also noting burning and numbness affecting her feet. *Id.* at 187. Davis also complained of "being very sleepy" and feeling as though she is "about to fall asleep or falling asleep one to two hours after eating." *Id.* at 188.

On February 22, 2011, Davis visited her then-primary care physician (PCP), Larry A. Jinks, MD (Dr. Jinks). *Id.* at 319-321. Dr. Jinks examined Davis and reported things as normal. *Id.* at 319-320.

On April 19, 2011, Davis was seen by Dr. Sackler and complained of "daytime sleepiness that she has not experienced since she was diagnosed with sleep apnea and starting using CPAP."

*Id.* at 185. Dr. Sackler noted that plaintiff "wonder[ed] whether she could have narcolepsy." *Id.*

Davis reported to Dr. Sackler that "she has only been able to work a couple of hours a day . . . [,] [was] getting four hours of sleep during the day . . . [,] [and] wonder[ed] whether she should apply for disability." *Id.*

On June 29, 2011, plaintiff returned to Dr. Sackler for a routine follow-up of her widespread osteoarthritis. *Id.* at 181-183. Davis informed Dr. Sackler "that between her physical symptoms and her difficulty focusing and her fatigue, she is really not able to work full-time." *Id.* at 182. In an effort to address her daytime sleepiness, Davis was referred to a sleep medicine physician. *Id.* at 183. A neurological referral was provided to address plaintiff's complaints of paresthesias. *Id.* Davis and Dr. Sackler discussed a disability form that plaintiff brought with her that day; Dr. Sackler reported that "the form that she provided did not correspond well to the problems she has been having," and that after Davis completed her referrals, Dr. Sacker would be willing to provide a narrative. *Id.*

On July 12, 2011, Davis was seen by Philip Becker, MD, Medical Director of the Sleep Medicine Institute Presbyterian Hospital of Dallas, (Dr. Becker) to get "a second opinion about her sleep apnea, its treatment with [an] auto-adjusting CPAP . . . , and her acute worsening of excessive daytime sleepiness and intense dreaming of the last four months." *Id.* at 143; *see also id.* at 144-145, 172. Dr. Becker's report from the visit shows that Davis "ha[d] been identified in 2003 to have severe obstructive sleep apnea/hypopnea syndrome." *Id.* at 172. After talking with plaintiff, Dr. Becker concluded that he could not

> explain the abrupt change in excessive daytime sleepiness based upon history alone or information from the auto adjusting CPAP device. For this reason retesting [wa]s necessary to better define the appropriate CPAP levels, any underlying hypoventilation, potential central sleep apnea, abnormal leg movement activity, or CNS abnormalities. Mood disorder could be a possibility.

*Id.* As a result, Dr. Becker scheduled Davis for a complete comprehensive polysomnography at an affiliated sleep center (the Sleep Study). *Id.*; *see also id.* at 148, 168.

On July 13, 2011, Davis was seen by neurologist C. Fish Greenfield, MD (Dr. Greenfield) for complaints of neuropathy and spinal stenosis. *Id.* at 235. Davis presented with "increasing numbness and paristhesias in the feet" and reported "lumbar spinal stenosis[,] though no recent images [were] available." *Id.* Dr. Greenfield ordered a series of tests and images to better assess plaintiff's condition. *Id.* at 236. The testing, which took place on July 28, 2011, showed "findings . . . compatible with a moderate, predominantly axonal, sensorimotor polyneuropathy." *Id.* at 238, 1584.

On August 7, 2011, Dr. Becker reported the findings of the Sleep Study. *Id.* at 148. The Sleep Study tested Davis for both her well-documented sleep apnea and her recently reported excessive daytime sleepiness. In his report, Dr. Becker explained that

> [t]his study showed only moderate excessive daytime sleepiness by MSLT criteria, continued severe obstructive sleep apea/hypopnea, and control of breathing events by nasal CPAP at 5-8 CWP. . . .
> . . . .
> To assess her excessive daytime sleepiness, on the next morning she proceeded to the standard trial of the multiple sleep latency test that included 5 nap trials. . . . The mean sleep latency of 7.3 minutes shows a moderate severity of excessive daytime sleepiness. There were no abnormal onsets into REM sleep, greatly reducing the possibility of narcolepsy. Clinical judgment will have to be used to determine the reasons for her excessive daytime sleepiness that reportedly presented only in the last 4 months.

*Id.* at 148, 168.

On August 29, 2011, Davis returned to Dr. Jinks for a checkup. *Id.* at 317-318. Dr. Jinks again concluded that Davis's examination was largely normal. *Id.*

On September 1, 2011, plaintiff was seen by Cathy Fernandez, RN, MS, FNPC (NP Fernandez) of Dr. Sackler's office for a routine follow-up. *Id.* at 178-180. Davis reported that she

"continu[ed] to have significant mobility problems because of her low back pain and knees." *Id.*

at 178. The notes from that visit read:

> Osteoarthritis/depression. Ms. Davis returns today, continuing to have complaints of daytime sleepiness, low back pain, and knee pain. She reports being [sic] considering possible disability. She started the Nuvagil. She reports that this possibly makes her feel more depressed. Dr. Sackler has reviewed medical record and talked with her about her depression. . . . She discussed also possibly seeing psychiatry [sic] to help with her depression. In the interim we will await neurology evaluation. She is due to have MRI of lumbar spine.

*Id.* at 179.

On February 21, 2012, Davis returned to NP Fernandez for a follow-up visit for her severe widespread osteoarthritis. *Id.* at 224-225. Davis reported ongoing issues with excessive sleepiness and poor energy and that she felt depressed because she was sleeping all the time. *Id.* at 224. NP Fernandez assessed plaintiff to have osteoarthrosis involving multiple sites, noted that her spinal stenosis was considered stable, and recommended that Davis see a psychiatrist regarding her depression. *Id.*

On March 12, 2012, Davis was seen by Merle Filecia, NP (NP Filecia) of Dr. Jinks's office for refills of her medication. *Id.* at 311-314. Davis complained of an inability to stay awake; that she slept all day; but denied depression and sadness. *Id.* at 311.

On April 5, 2012, plaintiff was seen by Shirley OLeary, NP-C (NP OLeary) of Dr. Greenfield's office for a follow-up regarding a diagnosis of back pain, peripheral neuropathy, and neck pain. *Id.* at 232-234; 268-270. Davis reported that she had never undergone the MRIs previously ordered by Dr. Greenfield because her daughter was sick. *Id.* at 232. Plaintiff also informed NP OLeary that, after the Sleep Study, "Dr. Becker was thinking she had narcolepsy . . . [and] also felt she was depressed." *Id.* Davis went on to explain that "she is an attorney and spends most of her time in bed working." *Id.* NP OLeary noted that "[a] neuropsych eval . . . was

consistent with grief over the death of her parents, and consistent with some depression."[12] *Id.*

With respect to the timeline of her symptoms, plaintiff stated "that falling asleep frequently and

vivid dreams were most prominent in spring of 2011. Then fall of 2011, memory issues

surfaced." *Id.* Based on her evaluation, NP OLeary planned to order MRIs to evaluate plaintiff's

complaints. *Id.* at 234.

On May 22, 2012, Davis returned to Dr. Jinks to discuss possible disability. *Id.* at 309-

310. Dr. Jinks described the visit as follows:

> [Davis is] [h]ere to discuss possible disability status and wants me to fill out
> forms to declare her disabled, [l]engthy discussion. She feels that she has
> narcolepsy but her sleep doctor says that she does not. She wants me to render an
> opinion contrary to his in order to get disability granted. After discussion, she has
> known sleep apnea and is on a CPAP. She has excessive daytime sleepiness but
> has had no true episodes of narcolepsy. I do not believe that, on the basis of the
> information in hand, that I can overrule the opinion of a sleep expert. I offered to
> help her get an assessment by the Texas Rehab commission but she burst into
> tears and left the room.
>     As she left she loudly complained at the check-out desk and to the office
> manager. Letter of dismissal will be given.

*Id.* at 309.

On June 26, 2012, Davis underwent an echocardiogram that was performed by

cardiologist Melissa Carry, MD (Dr. Carry). *Id.* at 357-361. The echocardiogram was "ok," but

Dr. Carry noted plaintiff's morbid obesity, spinal stenosis, and "heart failure." *Id.* at 359.

On August 3, 2012, Davis underwent several MRIs, which had been ordered by Dr.

Greenfield. The MRIs impressions were: lumbar spine – "Multilevel multifactorial lumbar

spondylosis without high grade spinal canal or foraminal stenosis," *id.* at 1581; and cervical

spine – "Multilevel cervical spondylosis . . . resulting in varying degrees of left greater than right

---

[12] The neuropsychological evaluation to which NP OLeary refers was performed by Dr. Harris in
December of 2011. (AR at 1541-1545.) Sun Life states that despite repeated requests, Davis did not
produce Dr. Harris's records until she filed her appeal. (#27 at 12; #28 at 17 n. 4, ¶ 135; #34 at 8 n. 5.)

neural foraminal stenosis and mild to moderate spinal stenosis within the mid to upper cervical spine," *id.* at 1595.

On August 27, 2012, Davis saw rheumatologist Don E. Cheatum, MD (Dr. Cheatum). *Id.* at 347-352. Dr. Cheatum had seen Davis in the past for "one of the psoriatic or so-called 'seronegative rheumatoid variant' types of arthritis[,] but ha[d] not seen her in the office since about 2006." *Id.* at 352. Davis complained of "[w]orsening generalized arthritic pains for the past 2 or 3 months plus fatigue, which has been severe for about a year and a half." *Id.* After evaluating plaintiff, Dr. Cheatum ordered x-rays and noted that he needed to fill out Davis's disability form given that she has "chronic and permanent disability." *Id.* at 347. The x-ray reports for that day showed: "multilevel anterior thoracic spondylosis" with respect to images of her chest, *id.* at 353; "mild osteoarthritic changes" as to the right hand and wrist, right elbow, right shoulder, and portions of her right foot and ankle, *id.* at 354; "mild to moderate osteoarthritic change" in the midfoot (right), *id.*; "mild to moderate degenerative disc change seen at C6-7 [vertebrae of the spine] . . . [and] [e]xtensive anterior osteophytosis with a tendency for syndesmophytosis is seen at C5, C6, and C7," *id.*; "[m]ild to moderate anterior osteophytosis is seen in the mid and lower thoracic areas," *id.* at 355; "[d]egenerative disc change is seen in T12-L1 and mild to moderate disc change is seen in L1-2 . . . [and] [m]oderate anterior osteophytosis . . . especially in the upper lumbar and lower thoracic areas," *id.*; and with regard to the right knee, "rather severe narrowing of the medial compartment on weight bearing with moderate narrowing of the lateral compartment on weight bearing [s]evere osteoarthritic changes . . . in both compartments," *id.*

On September 13, 2012, Davis was seen by NP OLeary for a follow-up concerning her diagnoses of neuropathy, memory loss, and back pain and to discuss the results of her MRIs. *Id.*

at 1603-1605. Davis told NP OLeary that her excessive daytime sleepiness was getting worse and had resulted in an inability to work from her home. *Id.* at 1603. She also described pain when sitting and a great deal of weakness when walking several feet. *Id.* NP OLeary noted that the brain MRI of August 2012 was normal and that Davis brought her disability paperwork to the appointment. *Id.*

On September 17, 2012, Davis was seen by Dr. Cheatum. *Id.* 341-346. Dr. Cheatum reviewed and summarized the August 27, 2012 x-rays and lab tests and, in similar fashion to his August 27, 2012 finding, concluded that plaintiff "does have significant chronic and permanent disability based on her arthritic problems and other problems including her memory problems and/or depression, etc." *Id.* at 342.

### B. Attending Physician Statements.

In support of her claim for disability, Davis's neurologist and one of her rheumatologists submitted Attending Physician Statements (APS).

NP OLeary

The first APS was completed on September 20, 2012 by NP OLeary of Dr. Greenfield's office.[13] *Id.* at 252-261. In her APS, NP OLeary noted peripheral neuropathy, neck pain, gait abnormality, morbid obesity, spinal stenosis, and degeneration of lumbar disc as her diagnoses. *Id.* at 256. The date of first visit is listed as July 13, 2011, with the most recent having been September 13, 2012. *Id.* With respect to restrictions and limitations, NP OLeary simply crossed out the entire section and wrote "unable to work" in the space below. *Id.* at 257.

---

[13] This document is described as an APS by Dr. Greenfield in the initial denial letter, (AR at 395), however, it was actually completed by NP OLeary of Dr. Greenfield's office, *see id.* at 252.

<u>Dr. Cheatum</u>

The other APS was completed by Dr. Cheatum on September 26, 2012. *Id.* at 272-277. In

his APS, Dr. Cheatum listed rheumatoid and psoriatic arthritis, severe osteoarthritis of the knee,

spinal stenosis in the back and neck, as well as several conditions[14] as his diagnoses for Davis.

*Id.* at 273. Dr. Cheatum had seen Davis twice in 2012, on August 27th and again on September

17th, but otherwise had not seen Davis since 2006. *Id.* at 341, 352. As for plaintiff's restrictions

and limitations, Dr. Cheatum found, in relevant part, that Davis could: perform simple grasping,

drive occasionally, sit frequently, reach above her shoulder occasionally, lift 10 pounds

occasionally, and carry 10 pounds occasionally, but could not perform firm grasping or fine

manipulation. *Id.* at 274. With regard to any resulting physical impairment, Dr. Cheatum stated

"total and complete disability." *Id.*

C. <u>Sun Life's Initial Reviewers</u>.

As part of its initial review process, Sun Life sent Davis's claim file to medical

professionals to evaluate what, if any, cognitive and physical limitations Davis suffered from as a

result of her various comorbid conditions around December 2011 as well as at the time of her

termination in June 2012.

<u>Nurse Dionne</u>

On November 16, 2012, Sun Life enlisted the services of Loretta Dionne, RN (Nurse

Dionne) to review plaintiff's LTD claim and accompanying medical records. *Id.* at 366-371.

Nurse Dionne's report lists the medical records on which she relied[15] and details Davis's medical

history from July 2011 through September 2012. *See id.* at 367-370.

---

[14] The other diagnoses are illegible. *See* AR at 273.

[15] The documents listed are: the claim forms, APSs, D map, telephone memo, rehab folder, medical
records from Dr. Greenfield (sleep neurology) 15 pages, medical records from Dr. Becker (sleep

Nurse Dionne's findings with respect to Davis's LTD claim appear as responses to questions posed by Sun Life. *Id.* at 370-371. She listed Davis's conditions to be sleep apnea, obesity, osteoarthritis, and neuropathy. *Id.* at 370. Nurse Dionne deferred opining as to the effect of Davis's sleep apnea, but concluded that, as for Davis's other conditions, she did not see distinct changes around December 2011 or in June 2012 and noted that Davis "wanted to pursue disability as we enter 2012 and going forward." *Id.* at 370. With respect to the functional impact of Davis's ailments, Nurse Dionne stated that "it is reasonable there would be a functional impact on her ability to do light activities." *Id.* at 371.

Dr. Fuhrmann

On December 4, 2012, Sun Life asked Calvin P. Fuhrmann, MD, internal and pulmonary medicine, (Dr. Fuhrmann) "to evaluate the entire medical record to determine whether the restrictions and limitations outlined by [Davis's] treating physicians are supported by the records reviewed." *Id.* at 373; *see also id.* at 378-379. In a December 13, 2012 report, Dr. Fuhrmann, relying on the same set of medical records on which Nurse Dionne based her findings, *see id.* at 374, responded to questions posed by Sun Life and likewise concluded that there were no significant changes in Davis's conditions other than her subjective complaints around December 2011 or at the time she was terminated in June 2012. *Id.* at 375-376.

Dr. Fuhrmann began his report by addressing the two APSs submitted in support of Davis's claim. In so doing, he directed most of his attention towards Dr. Cheatum's APS because, as noted by Dr. Fuhrmann, NP OLeary's APS did not contain specific limitations and restrictions. As for Dr. Cheatum's APS, Dr. Fuhrmann disagreed with the proposed restrictions

---

medicine), medical records from Dr. Sackler (rheumatologist) 51 pages, medical records from Felicia NP/Dr. Jinks (PCP of Ellis County Medical Associates) 16 pages, medical records from Dr. Cheatum (Rheumatologist/new PCP) 28 pages, and medical records from Dr. Carry (Cardiologist). (AR at 367.)

relating to firm grasping and fine manipulation because Davis's "x-rays only show minimal changes of her wrists and hands." *Id.* at 375. In similar fashion, Dr. Fuhrmann concluded that the limitations found by Dr. Sackler were not supported by the medical record. *Id.*

Turning to the physical restrictions that Dr. Fuhrmann deemed supported, he stated that "[i]t is apparent that the claimant's arthritic condition would allow her to carry out sedentary activities as long as she was allowed to sit for an extended period of time, which her doctor has indicated she is capable of doing." *Id.* He found that there was no change in Davis's arthritis, which had been present since at least 2004. *Id.* at 376. Addressing the cognitive aspect of Davis's condition, Dr. Fuhrmann stated that Davis's "complaint of excessive [daytime] sleepiness occurred in July 2011" and found that there was no support for any alleged change in this condition during the relevant period.[16] *Id.* He also opined that her sleep apnea did not change during the time period in question. *Id.* Dr. Fuhrmann concluded the report by finding that Davis's physical capacity, as noted by her rheumatologist, was such that she could carry out sedentary activity. *Id.* at 376.

D. <u>Vocational Assessment</u>.

In an effort to determine the parameters of Davis's position with Apex – both physical and mental – Sun Life enlisted Sandra Boyd, MS, CRC, CDMS, a Rehabilitation Services Senior Consultant, to perform an occupational analysis of Davis's position as an ERISA attorney. *Id.* at 325-327. Boyd's October 8, 2012 report concluded that

Ms. Davis'[s] occupation corresponds to Corporate Counsel, DOT#110.117-022. . . .

---

[16] Davis asserts that Dr. Fuhrmann's conclusion runs contrary to the Sleep Study findings, which, according to her, show that she had moderate excessive daytime sleepiness as of December 2011. (#30 at 18; #31 ¶ 86.) The Sleep Study findings on which plaintiff relies were reported in August of 2011, a time at which Davis does not allege to have been disabled, yet she argues that these same findings evidence disability five months later.

> Ms. Davis'[s] occupation typically exists in the general economy, according to
> Open Options, as a Sedentary exertion level – i.e. lifting, carrying, pushing and
> pulling up to 10 lbs. occasionally, negligible lbs. frequently, negligible lbs.
> constantly. This occupation also typically requires occasional reaching, handling,
> fingering and visual accommodation; frequent talking, hearing and near acuity.
>
> Ms. Davis'[s] employer statement indicates that she was not required to lift. This
> lifting requirement is less than what is required for this occupation as it typically
> exists in the general economy.

*Id.* at 325. Boyd's report defines the position of corporate counsel to be

> business and financial counsel; corporate counsel; lawyer, corporation. . . .
> Advises corporation or other business concerning legal rights, obligations, and
> privileges in areas such as governance, compliance, finance, mergers and
> acquisition, corporate laws, patent law, intellectual property law, tax laws,
> employment law, cyberspace law, bankruptcy, and litigation: Studies
> Constitution, statutes, decisions, and ordinances of quasi-judicial bodies.
> Examines legal data to determine advisability of defending or prosecuting lawsuit.
> May act as agent of corporation in various transactions. May advise and represent
> firm doing business in foreign country regarding matters, such as finance,
> taxation, trade, licensing, intellectual property, contract negotiation, joint
> ventures, and resolution of legal disputes, applying knowledge of international
> laws. May be employee of firm (inside counsel) or employee of private law firm
> (outside counsel).

*Id.* at 325-326. In reaching these conclusions, Boyd reviewed and analyzed "job information

contained in the job title description, employer and employee statements for a position titled

ERISA Attorney, and utilizing Open Options' occupational database." *Id.* at 325.

On December 21, 2012, Boyd prepared an addendum to her original October 8, 2012

occupational analysis. *Id.* at 380-383. The purpose for the addendum was to respond to Dr.

Fuhrmann's December 13, 2012 report. In the addendum, Boyd concluded that:

> As noted in the 10/8/12 occupational analysis, Ms. Davis'[s] occupation of
> Corporate Counsel typically exists at a Sedentary exertion level. Sedentary
> exertion is defined as occasionally lifting/carrying up to 10 pounds, and/or
> frequently lifting/carrying negligible pounds and/or constantly lifting/carrying
> negligible pounds. Sedentary work requires sitting the majority of the time with
> only brief periods of standing/walking on an occasional basis. After review of the
> restrictions and limitations outlined by Dr. Fuhrmann on 12/13/12, it is this
> vocational consultant's opinion that Ms. Davis could perform the material and

substantial duties of her occupation within those restrictions and limitations as lifting > 10 pounds and prolonged standing/walking is not typically required of her occupation.

*Id.* at 380-381.

## E. Initial Claim Determination.

In a January 3, 2013 letter (the Notice of Denial), authored by Goodall, Sun Life informed Davis that it had completed its review, and her LTD claim had been denied. *Id*. at 384-398. The Notice of Denial set forth the Policy provisions potentially relevant to Sun Life's determination, *id.* at 384-387; a history of the claim, *id.* at 387; summaries of Goodall's June 8th and July 5th phone conversations and July 20th in-person interview with Davis, *id.* at 387-392; an explanation of plaintiff's position and hours worked based on Davis's own statements, discussions with her employer, the June 20th termination letter, and Boyd's review of the file, *id.* at 392-394; a breakdown of Davis's compensation, *id.* at 394; a description of the medical records on which Sun Life relied and to whom the claim was referred for medical review, *id.* at 394-396; the conclusion reached by Boyd, *id.* at 396; a summary of the claim, *id.* at 396-397; an explanation of why Sun Life determined that Davis's claim was denied, *id.* at 397; and plaintiff's right to appeal the decision, along with the appropriate steps for the appeal, *id.* at 398. With respect to the justification for denying Davis's claim, the Notice of Denial stated:

Based on the comprehensive reviews of all of the information in the claim file, including medical documentation and documentation of your physical activity, we have determined that you have retained the capacity to perform the Material and Substantial duties of your Own Occupation as such terms are defined in the policy after December 2011 and upon your termination from employment on June 20, 2012. Therefore you were not Partially Disabled or Totally Disabled per the terms of the policy beyond that date.

Additionally, based on your self report and documentation received from your employer, it appears that you are not eligible for benefits under this policy as you have not worked in an Eligible Class, working at least 24 hours per week since at least December of 2011 and possibly as early as December 2010 and you

experienced no loss of earnings until after your claimed onset of Total Disability following your termination on June 21, 2012.[17]

*Id.* at 397.

## F. The Appeal.

Six months later, on June 28, 2013, Davis, through counsel, filed her appeal of Sun Life's denial of her LTD benefits claim. *Id.* at 626-645. On September 14, 2014 and again on September 15, 2014, Davis filed supplements to her appeal.[18] *Id.* at 2062-2094; 2488-2495. The Appeal was assigned to Senior Consultant Lynda Lowe-Salek of Sun Life. *Id.* at 7.

### 1. Additional Medical Records.

After her initial denial of benefits in January of 2013, Davis was seen by a number of doctors, many of whose medical records were included in the documentation that was considered as part of her appeal. The relevant visits are set out below.[19]

On December 1, 2011,[20] Davis was seen by Jim Harris, Psy. D. (Dr. Harris) for a neuropsychological evaluation. *Id.* at 1541-1545. Dr. Harris's report states that Davis complained of sleep interfering with her daily functioning, as well as issues with memory and mood. *Id.* at 1541. In addition, Dr. Harris noted that "Davis reports that Dr. Becker ruled out narcolepsy and had attributed sleep disturbance to depression." *Id.* The results of the

---

[17] This date appears to be a typographical error given that the remainder of the relevant documents list Davis's date of termination as June 20, 2012.

[18] Davis was afforded a number of extensions. (AR 1567-1568, 1625, 1648, 1652-1653, 1656-1657, 2055.)

[19] While plaintiff submitted additional medical documentation in support of her appeal, no additional imaging was provided, and the only testing performed (other than her various doctors' in-person examinations) was Dr. Harris's December 2011 neuropsychological evaluation (conducted six months prior to her date of onset) and a Functional Capacity Evaluation from August of 2013.

[20] While this visit took place prior to Sun Life's initial review of Davis's claim, defendant posits that the record of the visit was not provided until it was submitted as part of the appellate process. *See supra* n. 12.

neuropsychological testing showed all of Davis's results to be within the average to above

average range. *Id.* at 1543-1545. Specifically, Dr. Harris concluded that:

> 1. Ms. Davis's pattern of performance reveals intact immediate memory, delayed memory, visuospatial/constructional ability, attention, divided attention, verbal fluency, and executive functioning (including trial-and-error learning and novel problem solving).
>
> 2. Ms. Davis['s] mild-to-moderate performance on measures of psychomotor speed, visual scanning and manual dexterity may be indicative of a mood or anxiety type disorder. Psychomotor agitation or retardation, hypersomnia, fatigue or loss of energy and diminished ability to think or concentrate are consistent with symptoms of a Major Depressive episode of moderate severity.
>
> 3. Because of the above noted depressive symptoms, and her emotional lability that continues regarding the loss of her parents two years ago, it is possible that her Major Depression may be exacerbated by a complicated bereavement. Ms. Davis is encouraged to seek grief support to allow her to work through such issues. Should depressive symptoms not remit, re-evaluation for antidepressant medication is recommended.
>
> 4. Because of her risk factors for vascular disease and possible early and subtle signs of such on brain function, careful following of medication regimen for high blood pressure (which she reports she has not been doing) as well as following the meal plan dictated by gastric sleeve surgery (which she also reports she has not been doing) is recommended. Ongoing follow up with her physician for cardiovascular issues remains indicated.

*Id.* at 1544-1545.

On January 25, 2012, Dr. Harris reviewed with Davis his findings and conclusions from the

neuropsychological evaluation conducted the previous month.[21] *Id.* at 1545. In response, "Ms.

Davis request[ed] [a] referral to a psychiatrist," and Dr. Harris recommended she contact his

intake staff for assistance. *Id.* No psychiatric records were submitted as part of the

Administrative Record.

---

[21] The record of this discussion appears in the form of a handwritten note inscribed on the last page of the December 2011 report. (AR at 1545.)

On May 13, 2013, Davis was seen by Dr. Greenfield for chronic, severe back pain and obesity. *Id.* at 1600-1602. Dr. Greenfield noted that plaintiff was unable to walk without a walker and that her posture was severely stooped. *Id.* at 1600. He also remarked that an MRI revealed multilevel degenerative disc disease with facet arthropathy; that Davis is "unable to work secondary to severe pain as she cannot maintain either a seated or standing position for any significant period of time," *id.*; and that "she has [obstructive sleep apnea] and is adherent with CPAP, but, has persistent daytime somnolence and difficulty with focusing," *id.*

On August 13, 2013, more than a year after Davis's date of termination, Christel Ray, PT, FAAOMPT conducted a Functional Capacity Evaluation (FCE) on Davis. *Id.* at 1788-1801. The FCE concluded that plaintiff could: lift –floor to waist occasionally (5%); lift – waist to shoulder occasionally (10%); lift – floor to shoulder occasionally (10%); carry – bimanual occasionally (3%); push occasionally (26.5%); pull occasionally (32%);[22] sit, stand, walk, climb stairs, reach shoulder level, reach desk level, reach floor level, and balance occasionally; unable to stoop or crouch; and, with regard to manipulative ability, was capable of object handling, fingering, simple hand grasping, and firm hand grasping frequently, and was able to perform fine/gross manipulation occasionally. *Id.* at 1790, 1795. As for "Maximal Voluntary Effort" and "Pinch Strength Testing" the report notes that plaintiff's test performance was inconsistent. *Id.* at 1790, 1795; *see also id.* at 1797.

The report details Davis's subjective medical and job history. *Id.* at 1791. Ray noted that Davis's posture was stooped, both sitting and standing, that her ability to stand was limited to three minutes due to pain, and that she had difficulty walking any distance and preferred to

---

[22] Only certain aspects of the evaluation contain percentages. Notably, "occasional" is considered to be 0-33%. *See* AR at 1790. There is some confusion in the report as a later portion of the document identifies these numbers as lbs. *See id.* at 1793.

ambulate with the assistance of her walker. *Id.* at 1792, 1795. In addition, the evaluation also

tested Davis's active range of motion. *See id.* at 1798-1800. Ray concluded that "the physical

demand requirements are in excess of those for [heavy, medium, light, and sedentary] work." *Id.*

at 1801.

On October 8, 2013, plaintiff saw Dr. Cheatum. *Id.* at 1615-1616. He described her as a

"54-year old disabled former employee benefits attorney" and stated that she

> has had rather severe psoriatic or seronegative RA type arthritis, with
> undifferentiated SpA, lumbar type. . . .
>
> She has had some lumbar spinal stenosis and cervical spinal stenosis and
> neuropathy type tingling of her lower extremities plus sleep apnea. She has had
> some popping or snapping of her left knee, especially, but she is having about an
> hour to an hour and a half of morning stiffness daily plus a lot of fatigue since she
> has been off Enbrel a bit.

*Id.* at 1615. Dr. Cheatum performed a musculoskeletal examination on Davis and concluded that

she has chronic disability from any gainful sort of occupation; is not able to sit for a prolonged

period of time without getting up; is not able to stand or walk well; has dysfunction of both of

her upper extremities; cannot do any lifting over 10 lbs. or carrying over 10 lbs.; cannot do fine

manipulation or feeling or sensation with the fingers of either hand; has severe fatigue; would

have to rest about every 15 minutes of every hour or two during the day; cannot do any climbing

ladders or overhead lifting; has a loss of memory and cognitive problems and is not able to do a

lot of cognitive type work or activity at the present time; and that, in his opinion, her disability

was permanent. *Id.* at 1616.

Later that month, on October 23, 2013, Davis was seen by Dr. Greenfield for obstructive

sleep apnea, obesity, and arthritis with chronic back pain. *Id.* at 1597-1599. In his report of the

visit, Dr. Greenfield remarked that "[a]s a result of her obesity and severe back pain, [Davis] is

unable to ambulate without a rolling walker . . . [,] unable to sit for significant periods of time . . .

[, and] spends much of her day in bed." *Id.* at 1597. He noted that "[u]ntil 2011, her sleep apnea was well controlled with CPAP; however she is now experiencing daytime somnolence which impacts her daily activities and ability to attend to tasks . . . raising the possibility of obesity hypoventilation syndrome." *Id.* Dr. Greenfield also recorded that plaintiff "continues to report difficulty with concentration and short term memory." *Id.* With respect to treatment, Dr. Greenfield concluded that plaintiff's continued weight gain was likely worsening her back pain and that her memory loss was "[l]ikely related to inadequately treated obesity hypoventilation syndrome." *Id.* at 1598.

2. Supplemental Attending Physician Statements.

Several of Davis's treating physicians provided APSs in support of her appeal.

Dr. Greenfield

On November 4, 2013, Dr. Greenfield completed an APS for plaintiff. *Id.* at 1573-1579. Dr. Greenfield's subjective findings are listed as "pain, fatigue, [obstructive sleep apnea], memory loss, morbid obesity, chronic back pain, arthritis, [and] daytime somnolence." *Id.* at 1575. With regard to a description of treatment, Dr. Greenfield refers to his treatment notes, which he attached to the APS. He found that Davis was unable to work, unable to sit up for more than two hours, had a failed bariatric surgery, worsening back pain, and obesity hypoventilation syndrome. *Id.* As for plaintiff's progress, Dr. Greenfield remarked an increase in weight gain, back pain, and memory loss. *Id.*

Unlike the September 20, 2012 APS submitted by NP OLeary of Dr. Greenfield's office, Dr. Greenfield's 2013 APS specifically addressed Davis's restrictions and limitations and found that she could: use her hands to perform simple grasping, but "not repetitive," firm grasping, and could not perform fine manipulation; could drive occasionally; walk occasionally (with the

comment of "rollator 20 feet"); sit occasionally for two hours or less; stand occasionally (with the comment of "1-2 minutes for transfer"); not bend, squat, climb, or twist; push and pull occasionally; balance occasionally (with the comment "for transfers but at risk for falls"); not kneel or crawl; reach above shoulder level occasionally; lift five lbs. occasionally; not carry any weight (with the comment "at risk for falls"). *Id.* Based on his findings, Dr. Greenfield concluded that Davis could not work within her restrictions and limitations and that her "limitations and inability to work are likely permanent if surgery for morbid obesity is not approved." *Id.* at 1576-1577. It is unclear from his APS what the date of onset was for these disabling conditions.

Dr. Cheatum

On November 5, 2013, more than a year after his September 26, 2012 APS, Dr. Cheatum submitted a second APS in support of Davis's appeal. *Id.* at 1611-1613. When compared to his initial APS, it is apparent that Dr. Cheatum's findings changed with respect to Davis's condition. In similar fashion to Dr. Greenfield's APS, it is unclear as to what time period Dr. Cheatum was referring, and therefore, it is not clear whether Dr. Cheatum's opinion of Davis's June 2012 condition changed or if he was referring to Davis as she presented in November 2013.

In his second APS, Dr. Cheatum found that "sitting is an inherent requirement of [plaintiff's] employment and she is unable to do this for more than a very short period (30 minutes at a time and a total of 1-2 hours per day) without resulting in severe and lasting pain," *id.* at 1611, whereas in his original APS, Dr. Cheatum found that Davis could sit frequently. *Id.* at 274. There is no explanation for this inconsistency in opinion.[23] Further, Dr. Cheatum, in his

---

[23] Dr. Fuhrmann specifically referred to Dr. Cheatum's initial conclusion that Davis could sit frequently in finding plaintiff capable of sedentary activity. (AR at 376.)

second APS, stated that he saw Davis "for years." *Id.* at 1611. This is true given that Davis first started treating with Dr. Cheatum in the early 2000's, however, there was a gap in treatment from 2006 to August 2012. *See id.* at 346. Despite the fact that prior to his August 27, 2012 visit with Davis he had not seen her since 2006, Dr. Cheatum, in his second APS, stated that "[b]eginning in about January 2012, Ms. Davis had worsening symptoms . . . . These symptoms prevented her from using the computer to generate the documents needed for her job tasks." *Id.* at 1611. In addition, Dr. Cheatum opined that "at least as of June 2012, Ms. Davis was and is permanently and totally disabled." *Id.* In reaching these conclusions, Dr. Cheatum fails to provide any explanation as to what restrictions and limitations Davis's conditions caused beyond the inability to "us[e] a computer to generate the documents needed for her job tasks,"[24] *id.* at 1611, or any basis for these new opinions.

Dr. Becker

On November 11, 2013, Dr. Becker prepared an APS for Davis as well as a declaration in support. *Id.* at 1618 (declaration); 1619-1621 (APS). In similar fashion to Dr. Cheatum's conclusions in his second APS, it is unclear on what medical evidence or record, beyond Davis's subjective complaints, Dr. Becker based his findings. Dr. Becker noted that Davis's excessive daytime sleepiness was confirmed in August 2011, via the Sleep Study, and that "[i]n the fall/winter of 2011/2012, Ms. Davis complained of worsening EDS and cognitive impairments." *Id.* at 1618. With respect to treatment, Dr. Becker reported that he prescribed Concerta for her worsening conditions in April 2012, however, the only records of treatment by Dr. Becker in the

---

[24] These conclusions appear to be based in part on a discussion with Davis as to what her former position entailed. *See* AR at 1611.

Administrative Record pertain to visits in July and August of 2011.[25] *Id.* As a result, it remains unclear whether Dr. Becker examined Davis at the time he issued her the 2012 prescription.[26] Dr. Becker concluded that "since at least April/May 2012, Ms. Davis is [sic] not able to work as an attorney or consultant." *Id.* Dr. Becker listed many of Davis's ailments with a date of first appearance as "about March 1, 2011," but declined to complete the restrictions and limitations portion of the APS, noting that this was "[a]ppropriate for patient's rheumatologist and cardiologist." *Id.* at 1619-1620.

Dr. Carry

On November 25, 2013, Dr. Carry, plaintiff's cardiologist, who, according to the Administrative Record, only saw Davis once, on June 26, 2012, for an echocardiogram, prepared an APS to be included in the claim file.[27] *Id.* at 1628-1633. Dr. Carry also prepared a declaration as to her opinion of Davis's medical state. *Id.* at 1635-1636. Dr. Carry's APS lists diabetes, sleep apnea, hypertension, morbid obesity, fatigue, and arthritis as plaintiff's diagnoses and history. *Id.* at 1628. With respect to physical impairment, Dr. Carry marked "sedentary capacity" and noted "to[o] big a body to move around." *Id.*

---

[25] Davis's statement of facts in support of her motion asserts that Dr. Becker also prescribed medication for her in December of 2011. (#31 ¶ 13.) However, when the citations to the Administrative Record on which this fact is supposedly based are scrutinized it is apparent that the documents in question are portions of Dr. Becker's July and August 2011 notes. *Id.* (citing AR at 168, 172.) The following sentence in the statement of facts, which explains that Davis stopped taking the medication, cites to a report from a visit with Dr. Sackler that occurred in September of 2011. *See id.* (citing AR at 179). This further contradicts plaintiff's assertion that treatment with Dr. Becker occurred in December 2011.

[26] Plaintiff, in her statement of facts, merely cites to Dr. Becker's November 2013 APS as evidence of the April 2012 prescription. (#31 ¶ 21.)

[27] Dr. Carry's APS lists the date of last visit as June 26, 2012 with the last examination on the same date. (AR at 1628.)

In her declaration, Dr. Carry recounted plaintiff's weight issues and failed weight reduction surgery as well as a number of conditions with which, as of June 2012, Davis was afflicted. *Id.* at 1635. Dr. Carry concluded her declaration by stating that

> [d]ue to her super morbid obesity, her weight and related worsening of her medical conditions and symptoms, it is my medical opinion that by June 2012, Ms. Davis had become unable to perform the material and substantial duties that an ERISA benefits consultant or attorney would have to perform.
>
> It is also my considered medical opinion that Ms. Davis continues to be incapable of working. There has been no improvement in her condition.

*Id.* at 1635-1636. Dr. Carry provides no explanation as to her understanding of what the material and substantial duties of Davis's position entail.[28] Despite these opinions, Dr. Carry, in the same APS, determined that Davis was able to use her hands repeatedly for simple and firm grasping and fine manipulation, and that she could sit continuously and had sedentary capacity. *Id.* at 1639.

### 3. Davis's Statements.

In addition to the supplemental APSs and medical records, Davis submitted two of her own statements in support of her appeal. *Id.* at 1550-1566, 2219-2227. The first statement, dated June 28, 2013, contains plaintiff's version of her medical issues, *id.* at 1550-1552, her description of the requirements of her position at Apex, *id.* at 1553-1557, a rebuttal to Sun Life's initial determination letter, *id.* at 1557-1560, clarifications and corrections regarding Goodall's notes of the July 20, 2012 in-person interview, *id.* at 1560-1562, a description of Davis's issues with Apex, *id.* at 1562-1565, and an explanation as to Dr. Jinks's May 22, 2012 statement in

---

[28] Dr. Carry finds Davis incapable of "perform[ing] the material and substantial duties" of her job, terminology that appears nowhere in the APS form provided by Sun Life, but rather, is the standard by which Sun Life determines disability.

which he accused plaintiff of attempting to persuade him to find contrary to Dr. Becker regarding a diagnosis of narcolepsy, *id.* at 1565-1566.

The second statement, dated September 14, 2013, includes a description of Davis's health the twelve months prior to her filing the disability claim, *id.* at 2219-2222, a list of all of her medical conditions and a note that they must be considered together, *id.* at 2222-2223, a description of events from Davis's perspective, *id.* at 2223-2224, plaintiff's discontent with Sun Life and other insurer's practices, *id.* at 2224-2225, and additional rebuttal information pertaining to the initial determination letter, *id.* at 2225-2226.[29]

### G. Third-Party Review.

On September 15, 2014, Lowe-Salek sent a request for medical review and opinion by doctors in the fields of rheumatology, internal medicine, and neurology to Network Medical Review Co., Ltd. (NMR), an outside vendor. *Id.* at 2059-2061, 2635. NMR, without influence from Sun Life, selected three physicians to review Davis's LTD claim. *Id.* at 2636. All three reports are dated October 7, 2014. *Id.* at 2414-2416, 2421-2423, 2427-2428. In similar fashion to the initial medical reviewers, the NMR reviewers' reports are in the form of responses to questions posed by Sun Life and address the periods of December 2011 through June 2012 and June 2012 through the date of review.

---

[29] Davis also submitted statements of coworkers at Apex as well as others with whom she interacted in her capacity as a benefits consultant, her Social Security Administration Function Report, information pertaining to adverse actions against Dr. Fuhrmann, job postings for similar positions, the qualifications of her treating physicians, several articles, information about Sun Life's decision-making process, and an order from a Northern District of Illinois case. (AR at 1673-1674 (listing supplemental documentation), 2489 (same).)

Dr. Hoenig

The first NMR reviewer was neurologist David Hoenig, MD (Dr. Hoenig), who concluded that Davis's symptoms and complaints were not consistent with the diagnostic findings. *Id.* at 2417. He noted that her complaints regarding shoulder, back, and neck pain with numbness in her feet were not supported by the MRI and went on to find that her inability to walk unaided was not explained by the reduced vibration in her feet and mild weakness in her legs. *Id.* With respect to Davis's cognitive issues, Dr. Hoenig concluded that plaintiff's complaints were not consistent with the neuropsychological testing. He, like Dr. Harris, found that Davis's cognitive ailments were in line with symptoms of a major depressive episode of moderate severity and not related to any neurological pathology. *Id.* Based on the medical record, Dr. Hoenig determined that, from a neurological perspective, there were no restrictions or limitations that were medically supported during the relevant period. *Id.*

Dr. Payne

The second NMR review was performed by Dennis Payne, Jr., MD (Dr. Payne), who is board certified in internal medicine and rheumatology. *Id.* at 2420-2425. Dr. Payne concluded that, based on Davis's claim file, the diagnoses of fibromyalgia and chronic fatigue syndrome were appropriate.[30] *Id.* at 2423. Dr. Payne remarked that, with respect to fibromyalgia, there was widespread pain in the extremities and trunk and that the laboratory and imaging data was normal without specific features to support any other process. *Id.* In like manner, Dr. Payne found many of Davis's subjective complaints and ailments, such as a 50% reduction in usual activity, chronic sore throat, adenopathy, and flu-like aches in the muscular regions to be

---

[30] Davis makes much of the fact that Dr. Payne diagnosed her to have fibromyalgia in his review of her records. (#30 at 22-23.) Disability resulting from fibromyalgia is limited to a much smaller payout than general disability. Sun Life did not find Davis to have fibromyalgia.

consistent with chronic fatigue syndrome and also noted that there was no exam or testing data to support a systemic disease process. *Id.* As for any limitations or restrictions based on Davis's ailments, Dr. Payne stated that the only "objective findings in this file that is [sic] supported as producing restrictions a[nd] limitations are the imaging data of the knees, which reveal severe degenerative changes." *Id.* at 2424. These findings, in Dr. Payne's opinion, supported the limitation of weight bearing for only 15 minutes at a time for four hours total in an eight hour day, as well as not being able to climb ladders or stairs. Beyond this, Dr. Payne found that "[n]o other restrictions or limitations are supported due to any other conditions from a rheumatology standpoint." *Id.*

Dr. Perez

The final NMR review was conducted by Jose Perez, MD (Dr. Perez), who is board certified in internal medicine. *Id.* at 2426-2430. Dr. Perez listed Davis's diagnoses to be morbid obesity, hypertension, cirrhosis, and chronic heart failure. Addressing several of these individually, Dr. Perez found that Davis has hypertension, "but there is no evidence that this is not controlled well or that the claimant has complications from this diagnosis," *id.* at 2428; despite the mention of fatty liver in the chart, there is no evidence that she has cirrhosis, *id.*; as for the fact that she has been diagnosed with functional chronic heart failure, Davis's echocardiogram was normal, per Dr. Carry's note, and there is no specific exam finding for this diagnosis, *id.* With respect to limitations and restrictions during the relevant period, Dr. Perez stated that

> [t]he claimant would be limited to lifting no more than 10 lbs at a time. She could sit unlimited, and only occasionally walk or stand. Walking and standing would be less than 1 hours [sic] per day. These restrictions would be applicable during the time period under review and would be likely on an ongoing basis. The conditions applying to these restrictions would essentially be the morbid obesity.

No restrictions or limitations would be necessary for the other conditions from the
IM perspective.

*Id.* Dr. Perez went on to find that Davis "has [a] large number of co-morbidities which do not

permit mobility and have probably contributed to a number of musculoskeletal complaints and

respiratory difficulties including diagnosed [obstructive sleep apnea]." *Id.* at 2428.

## H. Final Claim Determination.

On November 21, 2014, Lowe-Salek, on behalf of Sun Life, sent a letter to plaintiff's

counsel (the Second Notice of Denial) informing her that Sun Life had "determined that the

decision to deny benefits on [Davis's] claim was correct." *Id.* at 2460-2471. The Second Notice

of Denial explained that Sun Life was of the opinion that

> Ms. Davis is not eligible for benefits because she was not working in an Eligible
> Class, working at least 24 hours a week, when she claimed Partial or Total
> Disability in December 2011, and June 20, 2012. In addition, Ms. Davis
> experienced no loss of earnings until she was terminated by her Employer for
> cause on June 20, 2012.
>
> Additionally, Sun Life has determined that Ms. Davis had the capacity to perform
> the Material and Substantial duties of her Own Occupation as of December 2011,
> and June 20, 2014 [sic]. As such, she was not Partially or Totally Disabled as
> defined by the Policy.

*Id.* at 2460. The Second Notice of Denial goes on to state plaintiff's claimed date of partial

disability was December 2011 and total disability as of June 20, 2012, *id.*; lists the Policy

provisions potentially relevant to the decision, *id.* at 2461-2465; provides a summary of the

initial claim review and decision, *id.* at 2465-2468; includes a review of the procedural history of

the appeal, *id.* at 2468-2469; summarizes the findings of the three independent medical

reviewers, *id.* at 2469-2470; explains why Davis was not in an Eligible Class based on her hours

worked, *id.* at 2470; lays out the basis for the appellate denial, which was based on the entire

claim file, *id.* at 2471; and sets out plaintiff's rights to copies of her file and to appeal under

ERISA, *id.*

IV. Discussion.

As set forth in both of its denial letters, Sun Life denied Davis's claim because: 1) she

was not in an Eligible Class, and therefore not covered under the Policy; and 2) she was not

disabled, as defined by the Policy, during the relevant period.[31] Davis contends that these

conclusions were reached in error.[32]

---

[31] To the extent that Sun Life denied Davis's claim for partial disability based on her inability to show a loss of earnings, Davis had not advanced any argument concerning this denial. Therefore, the court need not address it.

[32] The amended complaint also proffers a number of allegations with respect to procedural deficiencies – those being: the failure to produce various documents resulting in penalties pursuant to 29 U.S.C. §1132(c)(1), *see* #6 ¶¶ 26, 31, 33, the failure to provide an adequate notice of denial, *see id.* ¶¶ 23, 25-26, the failure to consider timely Davis's appeal of the denial, *see id.* ¶ 26, and the failure to inform plaintiff of her right to appeal, *see id.* At oral argument on the motions, plaintiff's counsel conceded these points save for Sun Life's failure to produce documents as alleged in Count III. (#48.) That said, Davis, in her motion for summary judgment and supporting papers, fails to advance, or even address, most these issues or her entitlement to penalties resulting therefrom, nor has she demonstrated that she suffered any prejudice. *McCarthy v. Commerce Group, Inc.*, 831 F. Supp. 2d 459, 488–489 (D. Mass. 2011); *see* ##29, 30, 42. The only assertion that bears mention is defendant's failure to retain the recording of the in-person interview with Goodall. (#30 at 20; #37 at 6-7.) Pursuant to 29 C.F.R. § 2560.503-1(h)(2)(iii), in order for Sun Life's appellate review to be deemed "full and fair," it must provide Davis with all records relevant to her claim for benefits. A record is considered to be relevant if it was "generated in the course of making the benefit determination, without regard to whether such . . . record . . . was relied upon in making the benefit determination." 29 C.F.R. § 2560.503-1(m)(8)(ii). Plaintiff, however, still has to show prejudice:

> [T]he First Circuit has held that procedural irregularities constitute prejudice when they are 'serious,' have 'a connection to the substantive decision reached,' and 'call into question the integrity of the benefits-denial decision itself.' *Bard v. Boston Shipping Ass'n,* 471 F.3d 229, 244 (1st Cir. 2006)(finding prejudice when the Plan did not comply with a single notice provision after deeming the claimant ineligible to apply for benefits—no reasons given for the rejection, no information regarding how claimant could perfect the claim, and a defective appeals process in that the same Board heard both the initial claim and the appeal). Plaintiff need not prove that a different outcome would have resulted had [Sun Life] followed the required procedures. *See Buffonge* [*v. Prudential Ins. Co. of Am.*], 426 F.3d [20,] 30 [(1st Cir. 2005)] (rejecting defendants' argument that 'an administrator's arbitrary analysis should be ignored if the end result— denial of benefits—can nonetheless be saved by a single valid piece of evidence that supports it'). However, that law does not impose strict liability for procedural failures

A. <u>Eligible Class</u>.

The Policy's LTD insurance covers individuals who are in an "Eligible Class," that is, those who are "Full-Time . . . Employees . . . scheduled to work at least 24 hours per week." *Id.* at 28, 38. In addition, the Policy requires all employees to be "Actively at Work" to remain covered. *Id.* at 95.

> An employee is considered actively at work if [she] performs the regular duties of [her] job at [her] home, provided the Employee can perform all the regular duties of [her] job for a full work day and could do so at the Employer's normal place of business if required to do so, and the Employee:
> - is not hospital confined; or
> - is not disabled due to an injury or sickness.

*Id.* at 37. "An Employee will cease to be insured on . . . the date the Employee is no longer in an Eligible Class." *Id.* at 95. "Ceasing to be Actively at Work will be deemed termination of employment," which, in turn, also equates to termination of coverage. *Id.*

---

either. For example, technical violations of ERISA do not necessarily impact the substantive decision; substantial compliance with the statute and regulations is sufficient. *See Terry v. Bayer Corp.*, 145 F.3d 28, 39 (1st Cir. 1998); *Recupero v. New England Tel. and Tel. Co.,* 118 F.3d 820, 840 (1st Cir. 1997)('We conclude that allowing a claim for relief because of inadequacy of formal notice without any showing that a precisely correct form of notice would have made a difference would result in benefit claims outcomes inconsistent with ERISA aims of providing secure funding of employee benefit plans.').

*McCarthy*, 831 F. Supp. 2d at 488–489. Here, while Davis disputes Sun Life's memorialized version of her in-person interview, she was afforded the opportunity to, and did, submit a statement refuting defendant's version of the interview and provided her own explanation as to what was said and as well as any relevant context. *See* AR at 1560-1562 ("Clarifications and Corrections Regarding Robert Goodall['s] July 20, 2012 File Memo"). These statements were provided to the NMR reviewing physicians and were considered by Sun Life in its appellate review. (#49-1.) Ergo, Davis fails to demonstrate how she was prejudiced by this violation.

In sum, the court deems Davis's procedural allegations to be waived or unsupported. In the interest of completeness, however, the court has laid out the relevant portions of the denial letters. "The denial letter need not detail every bit of information in the record; it must have enough information to render the decision to deny benefits susceptible to judicial review." *Orndorf,* 404 F.3d at 526. Sun Life's denial letters more than meet this standard.

Sun Life interprets the Eligible Class and Actively at Work provisions of the Policy to mean that the Policy "simply does not cover part-time employees," (#27 at 7), and takes the position that Davis was working part-time as early as 2010, and therefore was not covered under the Policy. In so doing, Sun Life interprets these two Policy provisions to act in concert, i.e., that a full-time[33] employee must be scheduled to work at least 24 hours per week *and* performing all of the regular duties of her job to be insured. (#39 at 2-3.) The court agrees to the extent that the failure to meet either requirement equates to termination of the employee's insured status. (AR at 95.) Sun Life, however, makes no mention of Davis's failure to be Actively at Work in its denial letters, other than defining the term in the "potentially relevant policy provisions" sections. *See id.* at 384-398, 2460-2471.

Defendant posits that Eligible Class and Actively at Work dovetail, so that limiting the definition of Eligible Class to the number of hours an employee was scheduled to work would allow an employee to cease working entirely, yet still remain covered under the Policy so long as they were scheduled to work during the relevant period. Review of the Termination Provisions section of the Policy, *id.* at 95, undercuts defendant's position. Under the Policy, failure to remain in an Eligible Class and not being Actively at Work are two *separate* bases on which an employee may cease to be insured. *See id.* at 95 (listing what actions will constitute termination of coverage under the Policy). Thus, contrary to defendant's contention that "a salaried employee could stop working entirely and still retain coverage," (#39 at 2), Sun Life could simply terminate coverage based on the employee ceasing to be Actively at Work. Defendant's

---

[33] The term "Full-time basis" is defined in the Policy *only* with respect to the termination of benefits based on the employee's ability to return to work and "means the Employee is able or has the capacity to perform the Material and Substantial Duties of [her] Own Occupation for the number of hours the Employee normally performed [her] Own Occupation prior to [her] Total or Partial Disability." (AR at 86.)

argument that Actively at Work must be read into the term Eligible Class misconstrues the Policy language, and, in addition, because Sun Life failed to advance such a position in either of its denials, it is not a basis on which Davis could be deemed uninsured.[34] Thus, the court will turn to Davis's hours worked to determine if she was in an Eligible Class, and therefore subject to coverage under the Policy.

Sun Life further argues that plaintiff was not in an Eligible Class because Davis was not working the requisite 24 hours per week as of December 2011, as evidenced by her statements made in her initial claim for partial disability, (AR at 411), her billable records, *see id.* at 305-07, and appointment calendars, *see id.* at 393, 397, 2468, 2478. (#27 at 7-8.) Defendant asserts that as there is no documentary evidence to support Davis's contention that she worked the requisite hours, Davis failed to meet her burden of demonstrating that she was in an Eligible Class.

Sun Life overstates what is required under the Policy, given that an Apex employee must only be "scheduled" to work at least 24 hours a week to be in an Eligible Class. (AR at 28.) Here it is uncontroverted that, prior to her termination, Davis was a full-time salaried employee (as stated by Apex) and was never scheduled to bill a certain number of hours. *Id.* at 121, 125-129; *see also id.* at 13 (Apex statement ("only producing 40 hours of billable work per month since December seemed correct.")); 132-133 (email from Amanda Moore); 139-140 (Apex termination letter); 442-444 (Apex CFO letter). Receipt of her full salary is evidence enough that Davis was in an Eligible Class. Davis's motion should not be denied on the basis that she was not insured during the relevant period.[35]

---

[34] In its reply to Davis's opposition, Sun Life characterizes its reference to Actively at Work as merely reinforcing the premise that an employee who no longer works full-time, is no longer covered. (#39 at 3 n. 3.)

[35] As a result of this conclusion, there is no need to address Davis's argument that Sun Life failed to notify her that she was no longer insured or return her insurance premiums. (#37 at 1-2.)

B. <u>Disabled Under the Policy</u>.

Pursuant to the Policy, an employee earning $100,000.00 or more per year is considered totally disabled if

> during the Elimination Period and the next 24 months, the Employee, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of [her] Own Occupation. . . .
> . . . .
> To qualify for benefits, the Employee must satisfy the Elimination Period with the required number of days of Total Disability, Partial Disability or a combination of days of Total and Partial Disability.

(AR at 49.) The Elimination Period for LTD income insurance is "90 days, or the end of the Short Term Disability Maximum Benefit Period, whichever is later." *Id.* at 34. "The Elimination Period . . . begins on the first day of Total or Partial Disability." *Id.* at 45. The Policy defines "Material and Substantial Duties" of one's occupation as "the essential tasks, functions, skills or responsibilities required by employers for the performance of the Employee's Own Occupation" and goes on to explain that these duties "[do] not include any tasks, functions, skills or responsibilities that could be reasonably modified or omitted from the Employee's Own Occupation." *Id.* at 46.

> Own Occupation means the usual or customary employment, business, trade, profession or vocation that the Employee performed as it is generally recognized in the national economy immediately prior to the first date Total or Partial Disability began. Own Occupation is not limited to the job or position the Employee performed for the Employer or performed at any specific location.

*Id.* at 47 (emphasis omitted). "An Employee's rights to any disability benefits are determined on the date the Employee's disability begins." *Id.* at 107.

Turning to Davis's disability status, it is apparent from the Administrative Record that Davis has suffered and continues to suffer from a number of comorbid conditions. Plaintiff must,

however, demonstrate not simply the existence of these maladies, but that they resulted in her inability to perform the Material and Substantial Duties of her Own Occupation during the Elimination Period. *See Orndorf*, 404 F.3d at 526. Davis's date of disability onset is her date of termination, June 20, 2012.[36] Therefore, as defined by the Policy, Davis's "Proof of Claim" for disability "must include evidence demonstrating the disability including, but not limited to, hospital records, Physician records, Psychiatric records, x-rays, narrative reports, or other diagnostic testing materials as appropriate for the disabling condition," showing that she was disabled on that day and throughout the 90-day Elimination Period. (AR at 103.) Sun Life concluded that Davis failed to meet her burden and the court agrees.

Review of plaintiff's papers shows that much of Davis's argument is premised on her personal interpretation of various medical reports, job duties, and physicians' statements as opposed to a showing, via contrary medical and vocational opinions, that she was in fact incapable of performing the Material and Substantial Duties of her position. Davis contends that it was the combination of her comorbid conditions that led to her being disabled. (#30 at 16; #42 at 9.) While it is true that Davis's subjective complaints and opinions may not simply be ignored, here, plaintiff offers little else to bolster her claim.[37]

---

[36] There is some confusion as to Davis's date of disability. Davis's disability date for her initial partial disability claim was determined to be December 2011. (AR at 14-15.) Davis later converted her claim to total disability as of June 20, 2012. *Id.* at 13, 327, 388. Sun Life, in its claim forms, lists Davis's date of total disability to be April 1, 2012, *id.* at 112, 366, 378, and Davis, in her papers, states that she "submitted a claim for benefits in June 2012," (#6 ¶ 16), yet later claims her "date of disability [to have been] April/May 2012," (#31 ¶ 25). As is made clear below, Davis was not totally disabled on the day she was terminated, nor at any point prior to that date.

[37] Davis makes much of the fact that her statements were not provided to the medical reviewers. (#42 at 8.) After inquiry by the court at the July 18th hearing, defendant produced a second affidavit from Jillian Croteau of Sun Life (#49-1) in which Croteau explains that the NMR reviewers were in fact provided with both of Davis's statements. *See* #49-1 at 2. The declaration goes to explain that the NMR reviewers were also provided: Goodall's notes of the June 8, 2012 telephone interview with Davis, (AR at 400-401); Goodall's notes of his in-person interview with Davis at her home on July 20, 2012, *id.* at 402-420; the statements of Michelle Gallop, *id.* at 1538-1540, Beatriz Gonzalez, *id.* at 1546, Ronald Davis, *id.* at 1547-

To be clear, this not a case like *Tracia v. Liberty Life Assurance Co. of Boston*, 164 F.

Supp. 3d 201 (D. Mass. 2016) (proffered by plaintiff's counsel at the July 18th hearing) where

plaintiff has been diagnosed with a condition for which there is no measure of its effects beyond

her subjective complaints.[38] Here, Davis's cognitive and physical issues were amenable to

testing, and in fact were tested, as evidenced by the Sleep Study, Dr. Harris's neuropsychological

evaluation, x-rays, MRIs, and the FCE. Her failure to seek additional testing and treatment for

certain ailments, and the fact that the medical records do not show that these conditions

worsened as she contends, does not mean that her subjective complaints trump the absence of

anything in the record to support her claim.

In addition, Davis's statements to her various doctors were inconsistent. A telling

example is in her conversations with doctors concerning a potential diagnosis of narcolepsy. The

record is clear that on August 7, 2011, Dr. Becker, via the Sleep Study, determined that Davis

was not afflicted with narcolepsy. *See id.* at 148, 168. Davis reported this to Dr. Harris on

---

1548, Sophie Davis, *id.* at 1549, Mary B. Whipple, *id.* at 1805, Nancy Furney, *id.* at 1807, Susan
Lancaster, *id.* at 1856-1858, Vicki Hjornevick, *id.* at 2496, and Jared Pope, *id.* at 2497-2500; materials
from plaintiff's counsel, *id.* at 625-645, 1706-1738, 2488-2495; as well as the other portions of the record
as set out above. (#49-1 at 2.)

[38] In *Tracia*, the plaintiff suffered from, *inter alia*, chronic back pain and chronic regional pain syndrome,
which is "a chronic neurological syndrome characterized by severe pain," a diagnosis with which the
defendant did not take issue. *Tracia*, 164 F. Supp. 3d at 208 (internal citation and quotation marks
omitted); *id.* at 223. The crux of *Tracia* was the policy's requirement that Tracia provide the defendant
with "objective evidence" to support his claim for disability, which the defendant concluded he failed to
do. *Id.* at 223. The court concluded that the appellate reviewers' decision to find that the administrative
record failed to evidence any objective support for Tracia's claims, yet were able to determine, on the
very same record, that Tracia retained the capacity to carry out full-time sedentary work was
unreasonable. *Id.* at 226. Here, there is no requirement that Davis produce objective evidence, *see* AR at
103, nor is there any discord between the conclusions of the initial and appellate reviewers. *Cf Tracia*,
164 F. Supp. 3d at 225 ("[the opinions of the appellate reviewers] are also inconsistent with the opinions
of nearly all of the remaining health professionals who treated the plaintiff or reviewed his case file,
including those who were working for Liberty or were retained to review the file on behalf of the
defendant.").

December 1, 2011. *See id.* at 1541 ("Ms. Davis reports that Dr. Becker *ruled out narcolepsy* and had attributed sleep disturbance to depression.") (emphasis added). Yet, four months later, on April 5, 2012, Davis reported to NP OLeary that "Dr. Becker was thinking she had narcolepsy." *Id.* at 232. A month after that, on May 22, 2012, the record shows that Davis attempted to persuade Dr. Jinks to find that she had narcolepsy, despite Dr. Becker's conclusion to the contrary. *Id.* 309. At a minimum, these inconsistencies degrade the credibility of, and weight accorded to, Davis's complaints and opinions.

1. Material and Substantial Duties of Her Own Occupation.

With respect to the determination as to what constitutes the Material and Substantial Duties of her position as it is generally recognized in the national economy, Davis takes issue with the adequacy of Boyd's vocational assessment, yet she only cites to sections of her statement of facts filed in support of her motion, which in turn quotes a statement she submitted on appeal. In other words, her argument is based on her own opinion. (#30 at 12-14 (quoting AR at 1553-1556); #31 ¶¶ 60, 61 (same); #37 at 10); *see also* #30 at 19 (arguing that Davis was not employable based on her interpretation of her duties)[39] (citing (#31 ¶¶ 60, 61)). Plaintiff posits that her statements more accurately reflect the parameters of her position at Apex, and therefore should have been considered as part of the vocational assessment. She could have submitted a professional vocational assessment, but did not. Davis's characterization as to what her job entailed, on its own, is insufficient to refute the conclusions of a vocational expert.[40]

---

[39] To the extent plaintiff argues that she was, and is, not employable, this assertion misconstrues the metric by which her claim is to be determined.

[40] Davis also offers statements from Marc Whipple, a coworker, (AR at 1805), Nancy Furney, chair of the Taxation, Employee Benefits & Private Business Practice Group at Winstead, PC, *id.* at 1806, Vicki Hjornevick, formerly a client of Apex, *id.* at 2496, Jared Pope, former general counsel at Apex, *id.* at 2497-2500, and Linda Konarik, an actuary, *id.* at 2542, all opining that Davis was totally disabled and unemployable. None of these individuals claim to have any special qualifications to support their opinions

Sun Life retained Boyd, who identified the physical and mental components of the position in question as it is generally recognized in the national economy, a practice that comports with the law of this circuit. *See McDonough v. Aetna Life Ins. Co.*, 783 F.3d 374, 380 (1st Cir. 2015) ("a reasoned determination of the existence of disability vel non requires, inter alia, a review of the material duties of the claimant's particular position and an assessment of how those duties align with the position as it is normally performed in the national economy. Only then can a claims administrator distill the medical and vocational evidence, apply it to the occupational profile, and make a reasoned determination of whether or not the claimant is disabled.") (internal citation omitted).[41]

### 2. Limitations and Restrictions.

After establishing the requirements of plaintiff's position as it occurs in the national economy, Sun Life then asked the initial medical reviewers, Nurse Dionne and Dr. Fuhrmann, to determine what, if any, cognitive and/or physical limitations Davis's comorbid conditions caused her during the Elimination Period.[42] In response, the reviewers determined that Davis's cognitive

---

as to Davis's duties and her status as disabled beyond their work in the field of employee benefits, personal experience, or interaction with Davis.

[41] Unlike the plaintiff in *McDonough*, here Davis relies on her own version of the duties of her position. *See McDonough*, 783 F.3d at 377, 381 n. 5 ("For his part, the appellant submitted a vocational assessment in support of his administrative appeal, which identified a different DOT position as most closely analogous to his job.").

[42] Davis points out that the medical reviewers were not asked questions concerning the cognitive requirements of her position. (#37 at 20.) However, the role of the reviewers here was to determine if there were *any* disabling limitations based on her comorbid conditions, which they found only to affect her physical abilities. Unlike the medical reviewers in *McDonough*, who, without the assistance of a vocational expert, reached the conclusion that McDonough was able to perform his own job, here it was Sun Life, with the assistance of Boyd's vocational assessment and addendum, that made the ultimate disability determination. (AR at 2635 (Croteau Decl.) ("The consulting physicians do not possess any authority to make claims decisions.").) Davis levies the same unavailing argument with respect to the adequacy of the NMR reviewers. (#30 at 24.)

ailments had not progressed, and therefore did not result in any limitation. With respect to her physical maladies, the reviewers concluded that she would be limited to sedentary work.[43] Thereafter, Sun Life, understanding that the only limitations deemed relevant by the medical reviewers were physical in nature, returned to Boyd to inquire as to Davis's ability to perform the physical components of her Own Occupation with these restrictions. After review of the proposed restrictions, Boyd concluded that Davis was able to carry out the Material and Substantial Duties of the position as it occurs in the national economy. With this information in hand and after review of the entire claim file, Goodall, on behalf of Sun Life, concluded that Davis was not totally disabled at the time she was terminated from Apex or during the ensuing Elimination Period.[44] (AR at 396 (discussing the assessment of any limitations on Davis's ability to perform her job); 380 (Boyd's addendum).

Sun Life's appellate review of Davis's claim yielded no more restrictive limitations than those found in the initial determination. As a result, Sun Life, conducting the same process of review – with the assistance of third-party medical reviewers and Davis's various submissions –

---

[43] Davis contests Sun Life's conclusion that she could perform sedentary work. Specifically, she argues that the medical records on which Sun Life relied were cherry-picked from the record, and therefore Sun Life ignored other "test results or other notes by her doctors that she is functionally unable to sit for extended periods." (#30 at 16.) Noticeably absent from Davis's argument is any citation to the record evidencing an inability to sit. Rather, plaintiff relies on her own statement submitted as part of her appeal. *See* #30 at 17 (citing #31 ¶ 60 (a quote from one of her statements)). In the same citation, Davis also cites to ¶ 25 of her statement of facts in support of her motion, which recites various portions of her 2012 MRI and offers the bald, conclusory statement that "[t]he test results corroborate her disabling conditions as of the date of her disability." *Id.*

[44] Plaintiff claims that Sun Life ignored the findings of Nurse Dionne and her conclusion that "there would be a functional impact on her ability to do light activities." (AR at 371.) The medical reviewers who were tasked with evaluating Davis's physical capabilities concluded that she was limited to *sedentary* work as a result of her conditions. Nurse Dionne's statement regarding Davis's difficulty with light activity is in line with the other reviewers' conclusion that Davis was limited to sedentary activity.

Additionally, Davis is critical of Nurse Dionne's failure to "mention" plaintiff's medically documented complaints. (#30 at 22.) However, Nurse Dionne explicitly stated that she reviewed Davis's medical records, which contained her documented complaints. (AR at 367.)

affirmed its initial decision. *See id.* at 2466 (citing Boyd's October 8,[45] 2012 vocational assessment), 2471.

### 3. Full and Fair Review.

ERISA requires that the review of a claim for benefits '"afford a reasonable opportunity . . . for a full and fair review' of dispositions adverse to the claimant. Nothing in the Act itself, however, suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830–831 (2003) (alteration in original) (internal citation omitted); *see also Stephanie C.*, 813 F.3d at 426 ("Although [plaintiff] contends that [defendant]'s denial failed to take into account the supporting materials that she had submitted [], that is sheer speculation. The mere act of upholding a denial of benefits cannot mechanically be equated with overlooking medical evidence that tends to support a different outcome. Nor was [defendant] obliged to accept unquestioningly the pronouncements of [the plaintiff]'s [doctors].") (internal citation omitted).

Here, the chronology of events and dates on which treatment and opinions were rendered is of substantial import. It is uncontroverted that Davis suffered from a variety of comorbid conditions in the years leading up to her filing for disability, many of which she remains afflicted with to this day. The Administrative Record also evidences a trend of continued weight gain, despite Davis's initial weight loss resulting from her gastric sleeve surgery in 2009. Understanding this, it is apparent that plaintiff's continued performance of the Material and

---

[45] The appellate denial incorrectly cites the date of the vocational assessment as October 2, 2012. *See* AR at 2466.

Substantial Duties of her position were she to have remained in the employ of Apex would not have been without difficulties. However, as is made clear below, the Administrative Record is largely devoid of medical records for the period preceding and through the Elimination Period that support the alleged worsening of many of Davis's conditions, with the exception of her subjective complaints. Indeed, the lion's share of the medical opinions on which plaintiff relies were not rendered until a year after the Elimination Period and lack support to justify these post hoc opinions.

a. Cognitive Limitations.

Davis is of the opinion that her moderate excessive daytime sleepiness was so extreme at the time she was terminated in June 2012 that she was rendered disabled. Review of the Administrative Record shows that this condition was diagnosed in August of 2011, a full year prior to her date of onset for her total disability claim, via the Sleep Study. Other than this study, the only record in support of her excessive daytime sleepiness and its supposed worsening in the spring and summer of 2012 included in the initial review appears in the form of Davis's subjective complaints to her various doctors about falling asleep, concentration issues, and memory loss. Neither of the APSs submitted in support of Davis's initial claim addressed these alleged cognitive limitations.

With respect to the appellate review of Davis's cognitive limitations, the landscape remained largely unchanged with regard to the existence of medical evidence to support plaintiff's contention. As noted above, the majority of plaintiff's supplemental medical records proffered in support of her appeal are opinions that were not rendered until almost a full year after her date of onset, well after the Elimination Period closed, and are principally recitations of Davis's subjective complaints. Several of the medical records that contain professional opinions

addressing plaintiff's cognitive deficits fail to provide a basis on which they are founded. Indeed, Dr. Becker, who diagnosed Davis with moderate excessive daytime sleepiness in 2011, merely states in his APS (created seventeen months after Davis's date of disability) that Davis complained of worsening cognitive impairments in the fall/winter of 2011/2012, that he unsuccessfully prescribed Concerta in April 2012, and that since April/May of 2012 Davis was unable to work as an attorney or consultant. Such a bald conclusion with no citation to medical evidence on which he relied, nor a history of regular treatment, or even a record of contact with Davis during the time periods to which his opinions refer, leaves Dr. Becker's findings far from controlling. *See Black & Decker*, 538 U.S. at 832 ("if a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled,' so a treating physician, in a close case, may favor a finding of 'disabled.'"); *Tracia*, 164 F. Supp. 3d at 226 (finding the *Black & Decker* court's mandate "particularly true where, as here, the record contains evidence indicating that [the plaintiff's treating physician]'s assessment regarding the plaintiff's functional limitations was based on the plaintiff's subjective reports rather than [the treating physician's] own observations or other objective criteria.").

Davis posits that Dr. Harris's December 2011 neuropsychological evaluation report, which was submitted on appeal, supports the existence of debilitating cognitive limitations. This contention is unpersuasive for several reasons. First, plaintiff's argument is premised largely on her interpretation of the December 2011 test results and their supposed application to her version of her job duties. *See* #37 at 20-21. More damaging to Davis's argument are the results of Dr. Harris's examination. In his report, Dr. Harris found plaintiff to have scored in the average or above average categories for the many of the tests conducted and, with respect to areas of "mild-to-moderate performance," concluded that these results "may be indicative of a mood or anxiety

type disorder" and "are consistent with symptoms of a Major Depressive episode of moderate severity." (AR at 1544.) There is nothing in Administrative Record demonstrating that Davis followed through with any additional testing or treatment in line with Dr. Harris's recommendation. Thus, far from anchoring Davis's claim that her excessive daytime sleepiness, as diagnosed in August of 2011, continued to exacerbate leading to disability, Dr. Harris's report evidences that her cognitive abilities were largely intact in December of 2011. Beyond December 2011, the Administrative Record is silent with respect to any medical record illustrating a decline in Davis's cognitive abilities save for her subjective complaints to her doctors.[46] With such a scant record, Davis fails to meet her burden of proving disabling cognitive maladies. There is no evidence to show plaintiff's excessive daytime sleepiness or any other comorbid condition[47] resulted in new or worsening cognitive limitations that were present during the Elimination Period.

b. Physical Limitations.

The Administrative Record offers substantially more with regard to Davis's physical limitations and medical evidence in support thereof. That said, the opinions of Davis's treating physicians, when viewed as a whole, yield anything but a consensus as to her physical abilities during the relevant timeframe. It is uncontested that Davis was, at best, able to perform at a

---

[46] The absence of any additional testing is all the more glaring given that, on May 22, 2012, at her appointment with Dr. Jinks in which she sought a diagnosis of narcolepsy, Davis was offered additional testing for her cognitive issues in the form of an assessment by the Texas Rehab commission, yet no such assessment appears in the Administrative Record. *See* AR at 309.

[47] To the extent Davis argues that her cognitive ailments were caused by some other condition, the only reference to an alternative source of her cognitive issues is the "possibility" of obesity hypoventilation syndrome noted by Dr. Greenfield in October of 2013. (#31 ¶ 72, #37 at 20); (AR at 1597 (notes of the October 23, 2013 visit with Dr. Greenfield), 1742 (Dr. Greenfield's November 4, 2013 APS listing obesity hypoventilation syndrome under the "description of treatment" section). Davis points to no other support for this potential diagnosis.

sedentary activity level, would be required to sit frequently, and would be limited in the distances she could ambulate. Beyond that, the opinions diverge. The main points of contention in the various opinions are plaintiff's ability to sit and to perform fine manipulation with her hands.[48]

Turning to the APSs submitted as part of the initial review, NP OLeary's APS failed to set out what, if any, restrictions and limitations resulted from Davis's diagnoses. As for Dr. Cheatum's APS, he concluded in part that Davis could sit frequently, a conclusion with which Dr. Fuhrmann agreed. Addressing Davis's manual dexterity, Dr. Cheatum found that she could not perform fine manipulation or firm grasping. Both Sun Life reviewers disagreed with this finding – Nurse Dionne concluding that there were no changes during the relevant periods and Dr. Fuhrmann positing that Dr. Cheatum's opinion was odds with Davis's x-rays. Sun Life, in its initial denial, concluded that Davis's physical limitations allowed her to perform at a sedentary activity level with the caveat that she be allowed to sit for an extended period of time.

Sun Life's appellate review likewise concluded that Davis could perform sedentary activity. The additional medical records and testing that were proffered in support of Davis's appeal occurred almost a year after Davis's date of disability and contain inconsistencies in the opinions of Davis's treating physicians both when compared to their own earlier opinions as well as each other's coterminous opinions. Notably, Dr. Cheatum concluded both in his October 2013 notes as well as his November 2013 APS that Davis was unable to sit for any period of time. In addition to being inconsistent with his earlier opinion, Dr. Cheatum's second APS provides information for periods of time during which he was not even treating Davis. This same discrepancy of conclusions without records of treatment presents itself in Dr. Becker's

---

[48] To the extent Davis premises her status as disabled on some other physical limitation, she has not advanced sufficiently such an argument.

November 2013 APS. Also included in the claim file for appellate review is the November 2013 APS of Dr. Carry who concluded that Davis had sedentary capacity, could perform simple and firm grasping as well as fine manipulation, and could sit continuously.[49] After review of Davis's medical records as well as various other portions of the claim file, the NMR reviewers uniformly concluded that Davis's subjective complaints were in line with the testing and various records to an extent that limited her to a sedentary activity level. Beyond this, the reviewers deemed Davis's complaints not to comport with the record.

Taking the issues of the ability to sit and manual dexterity in turn, Davis fails to prove that she was unable to sit during the Elimination Period. A showing that she suffers from a variety of comorbid conditions is insufficient to carry the day, even when taken together. Indeed, Davis was afflicted by many of these conditions that affect her physical abilities prior to her time at Apex. *See, e.g.*, AR at 344 (Davis "has had to use a walker to get around since about 2007 because of pain and disuse involving her lower extremities, especially her knees and also her back and feet and ankles."). The Administrative Record does not demonstrate that her condition declined such that she was unable to sit throughout the Elimination Period. All of the reviewing physicians concluded that she retained the ability to sit as did a number of Davis's own physicians. That several of her treating physicians, opining in support of Davis's appeal, one of whom contradicted his own earlier opinion without a justification or basis for the change, concluded that more than a year after the Elimination Period Davis was unable to sit, does not disturb the court's conclusion.

---

[49] Dr. Carry's APS highlights a pattern found in many of Davis's later-filed medical opinions: its lack of a medical basis to support the opinion. Davis was seen by Dr. Carry once for an echocardiogram. There is nothing in the record to show that Dr. Carry, a cardiologist, tested, or even examined, plaintiff's ability to use her hands. The Administrative Record does not support Dr. Carry's ability to render an opinion as to Davis's manual dexterity and that, in turn, affects the weight the opinion is afforded.

As for plaintiff's level of manual dexterity during the Elimination Period, she likewise fails to show that she was unable to perform the requisite manual acuity necessary to fulfill the Material and Substantial Duties of her Own Occupation. In similar fashion to her other allegedly debilitating maladies, the Administrative Record is largely devoid of evidence demonstrating restriction in the use of her hands during the relevant period.

The August 27, 2012 x-ray report showed "mild osteoarthritic changes" as to the right hand and wrist, right elbow, right shoulder. *Id.* at 354. On September 17, 2012, in his review of this report, Dr. Cheatum noted "[s]he did have signs suggesting mild bilateral carpal tunnel syndrome." (AR at 344.) Based in part on this report, Dr. Cheatum concluded, in his first APS, that Davis was able to perform simple grasping, reach above her shoulder occasionally, lift 10 pounds occasionally, and carry 10 pounds occasionally, but could not perform firm grasping or fine manipulation. *Id.* at 274. Dr. Greenfield, in his APS, also reported restrictions in Davis's manual capabilities. *Id.* at 1576. None of the reviewing physicians agreed with the extent to which Drs. Cheatum and Greenfield found Davis to be limited.

While not owed any deference, the opinions of the reviewing physicians need not be discounted entirely. This is not a case where the reviewing physicians did not have access to the August 27, 2012 x-ray report or any other relevant medical record and simply discredited Davis's treating physicians' conclusions out of hand. *Cf. Scibelli*, 666 F.3d at 41 (disagreeing with the defendant's decision to discredit the conclusion evidenced in one of the plaintiff's APSs, which conclusion was based on an MRI report that was not included in the administrative record; the court noted that "[the treating physician]'s two attending physician's statements are the only direct assessments of [the plaintiff]'s physical health during this period.").[50] Rather, the

---

[50] The First Circuit, in *Scibelli*, also took issue with the defendant's raising of a new justification for denying the plaintiff's claim that was not evidenced in any of its denials and that the defendant found the

Sun Life reviewers were provided all of the testing and imaging on which Davis's treating physicians based their conclusions and simply reached a different determination, one that comports with several of Davis's treating physicians and, more importantly, the record as a whole.

Given the divergence of Davis's treating physicians' opinions – ranging from no restriction to substantial – with respect to her manual dexterity, the absence of testing or imaging demonstrating continued, substantial worsening of the conditions affecting her hands, and the reviewing physicians' unified conclusion that she retained use of her hands such that she could perform at a sedentary level, the court finds that Davis has not met her burden of proving that she lacked the manual dexterity to perform the Material and Substantial Duties as defined by the Policy. *See Richards*, 592 F.3d at 241 ("'this is simply not a case where the only medical evidence ran in [claimant's] favor, thus casting into doubt a denial of benefits.'") (quoting *Orndorf,* 404 F.3d at 526) (alteration in original).

Thus, Sun Life was justified in deciding to uphold its initial determination that Davis's physical limitations were such that she could perform sedentary work.[51]

The court is sympathetic to Davis's plight. However, after review of the entirety of the Administrative Record and consideration of the parties' arguments, it is clear that Davis "received the full and fair internal review that 29 U.S.C. § 1133 prescribes," *Stephanie C.*, 813 F.3d at 426, and failed to meet her burden to prove disability. "[T]he most reasonable view of the

---

plaintiff disabled under another of its policies with a definition of disability that was "substantively indistinguishable" from the policy at issue. *See Scibelli*, 666 F.3d at 41-42.

[51] Davis asserts that Sun Life erred in its failure to consider the side effects of her medications. (#30 at 19-20.) However, she merely proffers that some of her medications had positive effects and others had negative effects and had to be discontinued. Without more, this argument is vacuous. The effects of her medications, as reported by Davis, appear in the Administrative Record that Sun Life reviewed prior to making its determination.

evidence is that [Davis] [did] not meet the definition of disability . . . ." *Orndorf*, 404 F.3d at 527.[52, 53]

## V. Conclusion.

For all of the reasons stated, I RECOMMEND that Defendant Sun Life's Motion for Summary Judgment (#27) be ALLOWED and Plaintiff Victoria Davis's Cross-Motion for Summary Judgment (#29) be DENIED.

## VI. Review by District Court Judge.

The parties are hereby advised that any party who objects to this recommendation must file specific written objections with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The objections must specifically identify the portion of the recommendation to which objections are made and state the basis for such objections. The

---

[52] Davis notes that she was awarded Social Security benefits and that Sun Life refused to assist with the application process. (#31 ¶ 34; #31-3 ¶ 2.) These benefits were granted in September of 2014, more than two years after the Elimination Period closed. *See* #31-3 ¶ 4. Moreover, the only evidence in support of Davis's application for Social Security benefits found in the Administrative Record is plaintiff's Social Security Function Report, which appears to be a form Davis filled out in support of her Social Security claim. *See* AR at 1779-1786. There is nothing in the Administrative Record demonstrating that plaintiff was awarded Social Security benefits. *Cf. Cowern v. Prudential Ins. Co. of Am.*, 130 F. Supp. 3d 443, 468 (D. Mass. 2015) ("Although the [Social Security benefit] award letter itself is not part of the administrative record, the fact that Ms. Cowern was awarded benefits is."). That Davis now submits an affidavit in support of her motion for summary judgment, *see* #31-3, in which she states that she obtained Social Security benefits, has no bearing on the court's review. Also noteworthy is the date of the Social Security Function Report, July 29, 2013, which is after Sun Life denied Davis's disability claim. Any argument that Sun Life erred in its failure to assist with this application process rings hollow given that defendant had already concluded that she was not disabled. *Cusson*, 592 F.3d at 228 ("We find nothing suspicious about Liberty's failure to credit Cusson's successful application for SSDI benefits, because Cusson was not awarded SSDI benefits until after Liberty denied her LTD benefits."); *see* AR at 84 ("Sun Life, at the Employee's request, will assist the Employee (*if appropriate*) through the various levels of the Social Security claim process.") (emphasis added).

[53] Davis sought a Waiver of Premium, which was denied by Sun Life. (#6 ¶¶ 16, 18; #30 at 24; #31 ¶¶ 37-38.) As defined by the Policy, a Waiver of Premium for totally disabled employees waives LTD premium payments for the employee "during any period LTD benefits are payable under th[e] Policy." (AR at 85.) Understanding that Sun Life deemed Davis not to have been totally disabled – a decision with which the court agrees – plaintiff has no right to any waiver of her premiums.

parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed. R. Civ. P., shall preclude further appellate review. *See Keating v. Secretary of Health & Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

<u>/s / M. Page Kelley</u>
M. Page Kelley
August 8, 2017                                                       United States Magistrate Judge